ANDREW M. SPURCHISE (5360847)
LITTLER MENDELSON, P.C.
Attorneys for Defendants
900 Third Avenue
New York, NY 10022.3298
212.583.9600

LYNDSEY M. MARCELINO (CA 299879)
ADMITTED PRO HAC VICE
LITTLER MENDELSON, P.C.
Attorneys for Defendants
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
612.630.1000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRANDON CARUSILLO and DAVID GATE, individually and behalf of himself and others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>FANSIDED, INC. d/b/a FANSIDED, SPORTORITY, INC. d/b/a MINUTE MEDIA, d/b/a FANSIDED<br><br>Defendants. | **Case No. 1:20-cv-04766-JPO** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CONDITIONAL CERTIFICATION**

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 3

    A.  Site Experts Produce And Curate Content For FanSites ..................................... 3

    B.  Site Experts Enter Into An Expert Services Agreement That Memorializes Their Right To Control The Services Provided ..................................... 4

    C.  Site Experts Have A Variety Of Fee Arrangements With FanSided ................... 6

    D.  Site Experts Operate Completely Independently, And Therefore Have Vastly Different Experiences ........................................................... 7

    E.  Plaintiffs' Declarations Underscore Site Expert Differences ............................. 9

III.  CONDITIONAL CERTIFICATION WOULD BE IMPROPER ................................. 10

    A.  Conditional Certification Is Not Automatic ...................................................... 10

    B.  Plaintiffs' Cannot Establish A Common Unlawful Practice Of Misclassification ............................................................................ 12

        1.  Plaintiffs' Evidence Falls Far Short Of Establishing That FanSided Implemented A Common Unlawful Practice ............................ 14

        2.  Plaintiffs Failed To Make A Factual Showing That Extends Beyond Their Own Circumstances ............................................ 15

    C.  Individual Inquiries Preclude Conditional Certification. ................................... 17

    D. Variations In Potential Exposure Preclude Conditional Certification. ........... 21

IV.  NO CORRECTIVE NOTICE SHOULD ISSUE ................................................... 23

V.  PLAINTIFFS' PROPOSED NOTICE AND DISTRIBUTION PROCESS IS IMPROPER ......................................................................................... 24

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed v. T.J. Maxx Corp.*,
   103 F. Supp. 3d 343 (E.D.N.Y. 2015*)* ........................................................................... 11, 12

*Andel v. Patterson-UTI Drilling Co. LLC*,
   280 F.R.D. 287 (S.D. Tex. 2011) ................................................................................... 15, 20

*Archer v. Freedmont Mortgage Corp.*,
   No. GLR-12-1099, 2013 WL 93320 (D. Md. Jan. 7. 2013) .................................................23

*Bamgbose v. Delta-T Grp., Inc.*,
   684 F. Supp. 2d 660 (E.D. Pa. 2010)............................................................................*passim*

*Bouthner v. Cleveland Const., Inc.*,
   No. CIV.A. RDB-11-0244, 2012 WL 738578 (D. Md. Mar. 5, 2012).................................11

*Bradley v. Vox Media, Inc.*,
   No. CV 17-1791 (RMC), 2019 WL 1060804 (D.D.C. Mar. 6, 2019) ..................................15

*Brown v. Barnes & Noble, Inc.*,
   252 F.Supp.3d 255 (S.D.N.Y. 2017) ...................................................................................15

*Christianson v. Newpark Drilling Fluids, LLC*,
   No. H-14-3235, 2015 WL 1268259 (S.D. Tex. Mar. 19, 2015) ....................................*passim*

*Colson v. Avnet, Inc.*,
   687 F. Supp. 2d 914 (D. Ariz. 2010) ...................................................................................15

*In re Currency Fee Antitrust Lit.*,
   361 F.Supp.2d 237 (S.D.N.Y. 2005) .....................................................................................6

*Demauro v. Limo, Inc.*,
   No. 8:10-cv-413, 2011 WL 9191 (M.D. Fla. Jan. 3, 2011) .............................................2, 14

*Dinkel v. MedStar Health, Inc.*,
   880 F. Supp. 2d 49 (D.D.C. 2012) .......................................................................................23

*In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*,
   662 F. Supp. 2d 1069 (N.D. Ind. 2009) ..........................................................................2, 13

*In re Fedex Ground Package Sys., Inc. Employment Practices Litig.*,
   No. 3:05-MD-527 RM, 2010 WL 597988 (N.D. Ind. Feb. 17, 2010) ..................................13

*Guan Ming Lin v. Benihana Nat'l Corp.,*
   755 F. Supp. 2d 504 (S.D.N.Y. 2010) ............................................................... 11

*Guillen v. Marshalls of MA, Inc.,*
   750 F. Supp. 2d 469 (S.D.N.Y. 2010) ............................................................... 11

*Herrera v. Mattress Firm, Inc.,*
   No. 17-cv-22048, 2017 WL 4270619 (S.D. Fla. Sept. 26, 2017) ..................... 2, 12

*Hoffman-LaRoche, Inc. v. Sperling,*
   493 U.S. 165 (1989) ......................................................................................... 1, 11

*Klein v. Octagon, Inc.*
   No. 14 CIV. 6770 AT, 2015 WL 5821629, at *2 (S.D.N.Y. Sept. 30, 2015) ........ 17

*Levinson v. Primedia Inc.,*
   2003 WL 22533428 (S.D.N.Y. 2003) ..................................................... 14, 15, 16

*Lillehagen v. Alorica, Inc.,*
   2014 WL 12768156 (C.D. Cal. Dec. 18, 2014) ................................................... 6

*Lugo v. Farmer's Pride Inc.,*
   737 F. Supp. 2d 291 (E.D. Pa. 2010) ............................................................... 22

*Marsh v. Butler County School System,*
   242 F.Supp.2d 1086 (M.D. Ala. 2003) .............................................................. 15

*Mata v. Foodbridge LLC,*
   2 2015 WL 3457293 (S.D.N.Y. June 1, 2015) .................................................. 11

*Nabi v. Hudson Grp. (HG) Retail,*
   LLC, 310 F.R.D. 119 (S.D.N.Y. 2015) ............................................................... 14

*New York Taxi Workers Alliance, et al., v. Uber Technologies, Inc., et al.,*
   Case No. 16-cv-04098-AKH, 2017 WL 10402922 (S.D.N.Y. 2018) .................... 2

*Pennington v. Integrity Communs., LLC,*
   No. 1:12–cv–5 SNLJ, 2013 WL 357516, at *2 (E.D. Mo. Jan. 29, 2013)............ 15

*Pfaahler v. Consultants for Architects, Inc.,*
   2000 WL 198888 (N.D. Ill. Feb. 8, 2000) ......................................................... 14

*Romero v. H.B. Auto. Group, Inc.,*
   2012 WL 1514810 (S.D.N.Y. May 1, 2012)....................................................... 11

*Rutherford Food Corp. v. McComb,*
   331 U.S. 722 (1947).......................................................................................... 12

*Trinh v. JP Morgan Chase & Co.*,
   No. 07-CV-1666 W, 2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) ....................................15

*Weinstein v. Jenny Craig Operations*,
   132 A.D.3d 446 (1st Dep't 2015) ..........................................................................................6

*In re Wells Fargo*,
   571 F.3d 953 (9th Cir. 2009) ...............................................................................................15

*Yoder v. Fla. Farm Bureau*,
   446 F. Supp. 3d 956 (N.D. Fla. 2020) ....................................................................................2

**Statutes**

Fair Labor Standards Act ...................................................................................................*passim*

**Other Authorities**

Federal Rule of Civil Procedure 8 ..............................................................................................1

I.      **INTRODUCTION**

Plaintiffs Brandon Carusillo and Dave Gate's ("Plaintiffs") Motion for Conditional Certification should be denied. They ask this Court to conditionally certify a collective pursuant to the Fair Labor Standards Act ("FLSA") and issue notice to hundreds of Site Experts nationwide based on the bare assertion that Site Experts are misclassified as independent contractors. While the standard for conditional certification is "lenient," it is not non-existent, and the Court's approval is not a rubber stamp.

In assessing conditional certification, the Court must determine whether Plaintiffs have sufficiently demonstrated that certification would lead to the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity." *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Site Experts' independent contractor classification, standing alone, is not sufficient to satisfy this threshold.

Plaintiffs likewise cannot carry their "modest" factual burden with only unsupported assertions, conclusory allegations, and formulaic declarations. If that were enough, certification of a collective would be a mere formality in any case where the complaint meets the liberal pleading standards of Federal Rule of Civil Procedure 8.[1] To obtain certification, a plaintiff must submit competent evidence sufficient to demonstrate a common, *unlawful* practice under the FLSA. Here, Plaintiffs must make a showing that they and other Site Experts are actually misclassified under the multi-factor economic realities test. They have not done so.

Even if Plaintiffs' allegations and sparsely supported declarations were sufficient (which they are not), each Site Expert's experience is vastly different, and depends entirely on the choices each Site Expert makes with respect to how best to run their respective FanSites. Site Experts cover

---

[1] For the reasons set forth in Defendants' Motion to Dismiss, Defendants also dispute that Plaintiffs have met the pleading standard.

varying topics, from sports to movies to food; they negotiate different pay; they engage in different business endeavors both within and outside their relationship with FanSided; and they make varying decisions about how best to produce content and maximize page views on their FanSites, whether by writing themselves or engaging site contributors, which in turn leads to varying degrees of financial success. These individual choices made by each Site Expert—their skill and experience, their ability to control their profit and loss, and the lack of control exerted by FanSided—establish that Site Experts are not misclassified or, at a minimum, create diverse circumstances such that the Site Experts cannot be "similarly situated" for purposes of the economic realities test.

Numerous courts have denied motions for conditional certification that present the same threshold question of whether the members of the putative collective are independent contractors or employees under the FLSA. *See, e.g.*, *New York Taxi Workers Alliance, et al., v. Uber Technologies, Inc., et al.*, Case No. 16-cv-04098-AKH, 2017 WL 10402922 (S.D.N.Y. 2018) (denying Uber drivers' motion for conditional certification, and finding that several factors under the economic realities test weighed in favor of independent contractor status); *Herrera v. Mattress Firm, Inc.*, No. 17-cv-22048, 2017 WL 4270619, at *7–9 (S.D. Fla. Sept. 26, 2017); *Yoder v. Fla. Farm Bureau*, 446 F. Supp. 3d 956, 962 (N.D. Fla. 2020); *Christianson v. Newpark Drilling Fluids, LLC*, No. H-14-3235, 2015 WL 1268259, at *4 (S.D. Tex. Mar. 19, 2015), *reconsideration denied*, 2015 WL 1505834 (Apr. 1, 2015); *Bamgbose v. Delta-T Grp., Inc.*, 684 F. Supp. 2d 660, 669–71 (E.D. Pa. 2010); *In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 662 F. Supp. 2d 1069, 1083 (N.D. Ind. 2009). These courts correctly held that "applying the test would require an 'individualized assessment' which 'eviscerates all notions of judicial economy that would otherwise be served by conditional class certification.'" *Herrera*, 2017 WL 4270619, at *7

(quoting *Demauro v. Limo, Inc.*, No. 8:10-cv-413, 2011 WL 9191, at *4 (M.D. Fla. Jan. 3, 2011)). As in the above cases, the distinct individual experiences of Site Experts across the country preclude a finding that members of the proposed putative collective are similarly situated with respect to an unlawful practice. Certification under these circumstances would contravene the basic theory of judicial economy upon which the FLSA collective action procedure is based. The Court should deny Plaintiffs' Motion.

## II.   BACKGROUND

FanSided is a website that hosts a network of over 300 fan-focused sports, entertainment, and lifestyle online communities. (*See* Declaration of Zachary Best ("Best Decl.") ¶ 2.) Each individual FanSite is a forum for enthusiasts to discuss, write, and read about their favorite domestic and international sports and entertainment topics. (*Id.*) People around the world can post, comment, or otherwise contribute to any particular FanSite. (*Id.*) FanSided hosts this community and provides a platform for everyone to contribute content about their favorite teams or subject. (*Id.*) While FanSites are typically related to professional or college sports teams, they can be based on other entertainment as well, such as "Accept This Rose" a FanSite dedicated to the ABC reality show "The Bachelor," or "Guilty Eats," the food-related FanSite that provides "top-notch news about menus, specials, promotions, health information for the fast food, restaurant industry, as well as news from Food TV." (*Id.*) Other topics include WWE wrestling, comic books, and horror movies. (*Id.*) The level of content published on each site depends not only on the Site Expert(s) running the site, but also the focus of the site (*e.g.,* a professional sport with 82 games versus an 8-episode television show) and the season (*e.g.,* a sports team's offseason versus during the season). (*Id.* ¶ 3.)

### A.   Site Experts Produce And Curate Content For FanSites.

Site Experts are engaged to produce and curate content for FanSites. (Best Decl. ¶ 4.) Site

Experts can do this by writing articles, generating photo galleries or slide shows, or otherwise curating online content that is ultimately posted to the particular FanSite. (*Id.*) Site Experts may also select, edit, and publish content from Paid Contributors.[2] (*Id.*) Paid Contributors are individuals engaged to write articles for a particular FanSite, but do not do any other FanSite-related work.[3] (*Id.*) Site Experts can be Site Experts for multiple FanSites and/or Paid Contributors for other FanSites; likewise, Paid Contributors to one site can be Site Experts for a different FanSite or multiple FanSites. (*Id.*)

Site Experts provide services across the country remotely from wherever they choose. (*Id.* ¶ 9.) They have no supervisors. (*Id.*) They use whatever tools and equipment they would like—typically their own computers or smartphones—to create, edit and curate content for the FanSite. (*Id.*) Site Experts often, but are not required to, have a Co-Site Expert to help curate content for the FanSite. (*Id.*) Site Experts do not have a fixed schedule or a minimum (or maximum) hours requirement and can work whenever they want, for however long they want. (*Id.*) Some spend 10 hours per week on FanSite-related work; others spend 30-35 hours per week. (*See* Misener Decl. ¶ 4; ECF No. 21-4 (Carusillo Decl.), ¶ 19.) Site Experts can decide not to work at all in any given week. (Best Decl. ¶ 9.)

Most Site Experts do not rely on FanSided earnings as their primary source of income and often have other full-time business endeavors or are students. (*See, e.g.*, Gurzi Decl. ¶ 2; Misener Decl, ¶ 2; Smith Decl. ¶ 2; Weiss Decl. ¶ 2; Oleszczak Decl. ¶ 2.)

### B.   Site Experts Enter Into An Expert Services Agreement That Memorializes Their Right To Control The Services Provided.

---

[2] Until recently, individuals were also free to contribute content to a FanSite as an Unpaid Contributor (also known as "User Generated Content"). Unpaid Contributors are under no contractual obligation to submit any content, and write articles or posts for publication on FanSites purely as a hobby or to gain writing experience. (Best Decl. ¶ 8.)
[3] Paid Contributors are paid based on the page views their individual content receives, but do not share revenue generated from the entire FanSite. (Best Decl. ¶ 7.)

Plaintiffs and other Site Experts signed an Expert Services Agreement regarding their respective relationships with FanSided. (ECF No. 1-2 and ECF No. 21-5.) The Expert Services Agreement specifically defines the Site Expert's relationship with FanSided as an independent-contractor relationship, and contains numerous provisions setting forth Site Experts' right to control the services they provide consistent with that classification, including:

- "Expert's relationship with Company will be that of an independent contractor, and nothing in this Agreement should be construed to create a partnership, joint venture, or employer-employee relationship." (*Id*. ¶ 4.)

- "The composition of the Services, the manner and means by which it is created and the times, places and locations where it is created shall be determined by Expert." (*Id*. ¶ 1).

- "Company acknowledges that this is a non-exclusive relationship and that Expert is free to enter into contracts to provide similar Services or other services to other companies . . . ." (*Id*. ¶ 4.3.)

- "Expert will be solely responsible for all tax returns and payments required to be filed with or made to any federal, state, or local tax authority with respect to Expert's creation of the Services[.]" (*Id*. ¶ 4.1.)

- "Company will not withhold or make payments for social security, unemployment insurance or disability insurance contributions, or obtain workers' compensation insurance on Expert's behalf." (*Id*.)

On or around August 1, 2020, FanSided rolled out a new Expert Services Agreement to current Site Experts. (Best Decl. ¶ 6, Ex. A.) The new Expert Services Agreement further underscores the parties' independent-contractor relationship. (*Id*. ¶¶ 4, 4.1, 4.5) The new Expert Services Agreement also contains an arbitration agreement and class-action waiver. (*Id*. ¶ 11.) The Arbitration Agreement contains an opt-out procedure, whereby any Site Expert can send an email (or letter, if they choose) to FanSided alerting of their intention to opt-out of the Arbitration. (*Id*.) Finally, in light of this lawsuit, FanSided included a carve-out provision in the Arbitration Agreement for current Site Experts specifying that the Arbitration Agreement would not apply to this case. (*Id*. ¶ 11.)

Starting on or around August 1, 2020, all new Site Experts (those who joined after the updated Expert Services Agreements were rolled out to current Site Experts)[4] received a version of the Expert Services Agreement containing the Arbitration Agreement, class waiver, and the opt-out mechanism identified above, but no carve-out for this lawsuit. (Best Decl. ¶ 6, Ex. B.)

### C. Site Experts Have A Variety Of Fee Arrangements With FanSided.

Generally, Site Experts receive fees correlated with the number of page views their FanSite(s) generate, irrespective of the number of articles they write themselves. (Best Decl. ¶ 12.) Site Experts can choose to focus primarily on writing original content or can rely on content curated from Paid Contributors, and primarily edit the original work of others. (*Id*.) Site Experts have no obligation to write a certain number of posts or articles per month—they can write as much or as little as they would like, or not write at all. (Best Decl. ¶ 10.)

Site Experts who operate a FanSite on their own receive fees associated with the page views for the entire FanSite on top of the fees associated with the page views of their own original content. (Best Decl. ¶ 12.) By default, Site Experts earn up to $2,500 per month per FanSite. (*Id*.) This can be, and is, negotiated by Site Experts. (*See* Smith Decl. ¶ 16; Best Decl. ¶ 11.) Site Experts can, and often do, earn more than $2,500 per month. (*See* Gurzi Decl. ¶ 15; Weiss Decl. ¶ 11.) In addition to negotiating, a Site Expert who wants to exceed $2,500 in fees can do so by becoming a Site Expert for another FanSite, contributing as a Paid Contributor on another FanSite, or can contract with FanSided to write a one-time unique piece on a particular topic for publication on a particular site. (Best Decl. ¶ 13; Gurzi Delc. ¶ 10.) There is no limit to the number of FanSites one

---

[4] Courts do not consider prospective workers to be putative collective members because they have not been subject to the allegedly unlawful practice at the time that they enter into a contractual or employment relationship with the company. *In re Currency Fee Antitrust Lit.*, 361 F.Supp.2d 237, 258 (S.D.N.Y. 2005) (upholding arbitration and class action waivers in a credit card transaction fee class action case when applied to new card members that joined after litigation); *see also Lillehagen v. Alorica, Inc.*, 2014 WL 12768156 at *7 (C.D. Cal. Dec. 18, 2014); *Weinstein v. Jenny Craig Operations*, 132 A.D.3d 446, 447 (1st Dep't 2015) (holding that the lower court improperly refused to enforce the arbitration agreements signed by employees who were hired after the litigation was commenced).

can be a Site Expert for, nor is there a limit to how many FanSites for which Site Experts can be a Paid Contributor. (Best Decl. ¶ 13.) There is similarly no limit to how many one-time pieces Site Experts can write for the main FanSided website. (*Id*.) As a result, Site Experts often move among and between these varying roles at their discretion. (*Id*.)

Site Experts who work with a Co-Expert split responsibilities and revenues associated with FanSite-related page views.[5] (Best Decl. ¶ 12.) The Expert Services Agreement provides that Co-Site Experts split the fees and responsibilities evenly by default. (*See, e.g.*, ECF No. 21-5, p. 12) However, the Agreement specifically allows Co-Experts to allocate fees and responsibilities between them: "If more than one expert is assigned to a FanSite, Co-Experts shall split revenue equally; *provided, however*, that Co-Experts shall have the right to allocate their responsibilities between them and advise [FanSided] to allocate the consideration in a *different proportion* to reflect such allocation of responsibilities." (*Id*.) (emphasis added). Accordingly, Site Experts can, and do, negotiate among themselves an appropriate split of revenue. (Best Decl. ¶ 11; Cockrum Decl., ¶ 10 (negotiating with Co-Expert to evenly split all fees, including individual content-generated fees).

### D.   Site Experts Operate Completely Independently, And Therefore Have Vastly Different Experiences.

Site Experts' practices and experiences vary greatly depending on the topic of their FanSite, their strategy in optimizing page views, and their own choices. Some Site Experts use the FanSite as a way to boost their writing career, while others do it as a hobby. (*See* Oleszczak Decl. ¶ 9.) Some Site Experts work alone on a particular FanSite, others have Co-Experts or work on

---

[5] Named Plaintiffs' and the Vincent Page declarations refer to a "labor budget" allegedly used by FanSided. *See* ECF 21-4, ¶ 12, 21-5, ¶ 11, 21-6, ¶ 12. While this term is undoubtedly used by Plaintiffs' counsel in an attempt to suggest that FanSided budgeted for "labor" costs in the way an employer might, there is no mention of a "labor budget" in the agreements or in any other document submitted by Plaintiffs. (ECF No. 21-5, p. 12.) Moreover, FanSided is unaware of that term being used in connection with anything related to Site Experts. *See also* Best Decl. ¶ 19 ("FanSided does not use the term "labor budget" to refer to anything related to Site Experts.")

more than one FanSite. (*See* Gurzi Decl. ¶ 12 (works alone on a FanSite); Misener Decl. ¶ 5 (decided to bring on a Co-Expert)). Some Site Experts work with 5 to 10 Paid Contributors. (*See* Oleszczak Decl. ¶ 9.) Other Site Experts work with as many as 90 Paid Contributors. (*See* Misener Decl. ¶ 13.) The time Site Experts spend on Site Expert work varies accordingly. (ECF No. 21-4, ¶ 19 (Carusillo alleging he worked 30-35 hours a week); Misener Decl. ¶ 4 (10 hours a week)).

Site Experts also have differing strategies for obtaining pages views and are free to develop those strategies without control by FanSided. Some Site Experts use Search Engine Optimization ("SEO") data to determine what words might be trending to decide how to pick a topic. (*See, e.g.*, Gurzi Decl. ¶ 16). For example, if a particular player is trending in the SEO data, Randy Gurzi may decide to write an article about that player to capitalize on the increased interest. (*Id*.) Another example: If Site Expert Brad Weiss looks at SEO data and sees that a particular type of article performed well, he will likely publish that type of article again in the future. (*See* Weiss Decl. ¶ 11.) FanSided does not require Site Experts to review SEO data. (*See id*.; Oleszczak Decl. ¶ 11.)

Site Experts also take different approaches to posting content. Some Site Experts try to have fresh content on the FanSite at all times (Weiss Decl. ¶ 11), while others are interested in fewer but more in-depth pieces (Misener Decl. ¶ 6). For example, Jacob Misener and his Co-Expert decided "based on [their] years of experience in what drives the most interest in a site" to post about four "analytical articles and well-reasoned opinion pieces" per day year round. (Misener Decl. ¶ 6). Misener and his Co-Expert decided to go this route, as opposed to "game previews and recaps or other quick-hit articles" because it is the best way to generate views in the saturated market for Cubs content. (*Id*.)

Site Experts have varying levels of experience. For example, some Site Experts have advanced education in a relevant area such as journalism (Misener Decl. ¶ 1) and broadcast media

(Oleszczak Decl. ¶ 2), while others do not (*see, e.g.*, ECF No. 21-5, Gate Decl. ¶ 6). Some Site Experts have experience writing for comparable or competing media websites and continue to freelance write while engaged as a Site Expert. (*See, e.g.*, Smith Decl. ¶ 10 (simultaneously wrote for other publications such as The Athletic and Forbes SportsMoney); *see also* Marcelino Decl. Exs. A-D (showing Plaintiff Carusillo writing for other publications). Many Site Experts have full-time jobs outside the writing industry. For example, Gurzi is a full-time property appraiser for the Columbia County Tax Assessors' Office. (Gurzi Decl. ¶ 2.) Brad Weiss is a full-time field underwriter sales person. (Weiss Decl. ¶ 3.) Duncan Smith is a professional poker player. (Smith Decl. ¶ 3.) Blake Cockrum is a full-time temporary employee of an automobile logistics company. (Cockrum Decl. ¶ 3.) Jacob Misener is a marketing manager for a sports equipment company. (Misener Decl. ¶ 2.) Even for Site Experts who write professionally, FanSided is typically only one source of work. Site Experts, including Plaintiff Carusillo, write for competing websites and even use FanSites to cross-market their work for other publications, as Smith did. (Marcelino Decl. Exs. A-D; Smith Decl. ¶ 10.)

    **E.**    **Plaintiffs' Declarations Underscore Site Expert Differences.**

    Plaintiffs' three proffered declarations from Site Experts are significantly different from the declarations of Randy Gurzi, Blake Cockrum, Duncan Smith, Brad Weiss, Jacob Misener, and Leigh Oleszczak. For example, Gurzi testified that he works 15 to 20 hours a week (Gurzi Decl. ¶ 11), Cockrum testified that he works 15 to 20 hours per week (Cockrum Decl. ¶ 6), and Misener testified that he works 10 hours a week (Misener Decl. ¶ 4). By contrast, Carusillo stated that he worked approximately 30-35 hours a week and more during the baseball season. (ECF No. 21-4, ¶ 19), Gate stated that he worked 30 hours a week all year round (ECF No. 21-5, ¶ 17), and Page stated that he worked 20-30 hours a week during the season and 10-20 hours a week during offseason (ECF No. 21-6, ¶ 17).

While Plaintiffs testify that they received direction from FanSided by frequent emails and instruction on how to write articles,[6] other declarants testify that they receive no direction from FanSided and only engage the FanSided Editorial Director as needed. For example, Smith states that his Editorial Director "shares story ideas or strategy" but no directives. (Smith Decl. ¶ 14.) Gurzi similarly states that his Editorial Director is not often in contact and only provides samples of articles that were successful on other pages. (Gurzi Decl. ¶ 8.) Cockrum similarly denies any control, stating: "My Editorial Director regularly sends emails with tips and recommendations for article topics, posting formats, and other metrics, but he does not dictate what stories I cover or when I post. No one at FanSided has ever forced me to do anything." (Cockrum Decl. ¶ 12.)

Finally, all of the declarants' earnings vary significantly: Weiss earns "$2,000-3,000 a month in fees" (Weiss Decl. ¶ 11); Smith earns "$2,500 per month regardless of ... page views." (Smith Decl. ¶ 16); Gurzi earns between $3,000-$3,500 per month (Gurzi Decl. ¶ 15). While Carusillo allegedly earned "$150-220 per biweek (ECF No. 21-4, ¶ 13), Gate allegedly earned $600-800 per month[7] (ECF No. 21-5, ¶ 12), and Vincent Page allegedly earned "$200-300 per month" (ECF No. 21-6, ¶ 11).

## III.   CONDITIONAL CERTIFICATION WOULD BE IMPROPER

### A.   Conditional Certification Is Not Automatic.

There is no presumption in favor of conditional certification. "[C]ertification is not automatic" and cannot be obtained "through conclusory allegations or unsupported assertions," as Plaintiffs attempt here. *See Mata v. Foodbridge LLC*, 2 2015 WL 3457293, at *6 (S.D.N.Y. June 1, 2015) (noting that a plaintiff's burden "is not non-existent" and "Plaintiff must offer actual

---

[6] Plaintiffs are alone in their contention they were required to write articles with a 300-word limit. Defendants note that Plaintiffs' Expert Services Agreements both identify a 250-word limit; not a 300-word limit. (*See* ECF No. 1-2; 21-5).

[7] Contrary to his assertion in his sworn declaration, FanSided's records confirm David Gate earned an *average* of $900 per month, sometimes earning up to $2,074.25 per month. (Best Decl. ¶ 16.)

evidence of a factual nexus between his own experience and the experiences of those he claims as similarly situated, rather than mere conclusory allegations") (internal quotation marks and citations omitted); *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 480 (S.D.N.Y. 2010) (plaintiff's burden on conditional certification "is not non-existent and the factual showing, even if modest, must still be based on some substance.") (internal quotation marks and citations omitted).

Plaintiffs must show they are "similarly situated" to the other members of the putative collective regarding the alleged violation of the FLSA. *Guan Ming Lin v. Benihana Nat'l Corp.*, 755 F. Supp. 2d 504, 508 (S.D.N.Y. 2010). Plaintiffs seeking conditional certification "must proffer substantial allegations of a factual nexus between the [plaintiffs] and potential opt-in plaintiffs with regard to their [alleged] employer's alleged FLSA violation." *Romero v. H.B. Auto. Group, Inc.*, No. 11 Civ. 386 (CM), 2012 WL 1514810, at *9 (S.D.N.Y. May 1, 2012). To meet this burden, Plaintiffs must set forth more than vague or conclusory allegations with "meager factual support" asserting that they are similarly situated to the group they seek to represent with respect to a single unlawful "policy" that violates the FLSA. *Bouthner v. Cleveland Const., Inc.*, No. CIV.A. RDB-11-0244, 2012 WL 738578, at *4 (D. Md. Mar. 5, 2012).

Further, the Court must find that, based on Plaintiffs' proposed theory of liability, notice is "appropriate." *Hoffman-LaRoche, supra*, 493 U.S. at 169; *Ahmed v. T.J. Maxx Corp.*, 103 F. Supp. 3d 343, 346 (E.D.N.Y. 2015*)* (noting that courts have discretion to grant conditional certification only in appropriate cases). The collective action mechanism is appropriate only if it will "make for more efficient and economical adjudication of cases." *Hoffman-La Roche, Inc.*, 493 U.S. at 180. To justify a conditional collective and issuance of notice, Plaintiffs need to allege more than merely that they engaged with FanSided and were allegedly misclassified. *See Ahmed*, 103 F.Supp.3d at 349–57 (courts routinely conclude that "the mere fact of a common FLSA-exempt designation,

job description or uniform training is insufficient to find [plaintiffs] 'similarly situated' for FLSA purposes").

Plaintiffs have not shown that notice should issue. Their paltry evidence is insufficient to show that there is nationwide violation of the FLSA. And, each member of the purported collective presents this Court with a distinct factual situation, requiring individualized application of the FLSA standard. Sending notice and inviting resolution of purported claims in this single case would not promote the purposes of the FLSA or judicial economy.

### B.      Plaintiffs' Cannot Establish A Common *Unlawful* Practice Of Misclassification.

Courts consider the following factors when determining whether an individual is an independent contractor under the FLSA: (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). The presence (or absence) of any one factor is not dispositive on employee status; such a determination depends "upon the circumstances of the whole activity." *Id.*

While the merits may not be directly at issue at this stage, the Court still must assess "whether the economic realities test will require an individualized inquiry or can be applied across the class." *Herrera*, 2017 WL 4270619, at *7; *see also Christianson, LLC*, 2015 WL 1268259, at *4 ("The Court emphasizes that it is not applying the economic realities test at this phase to decide whether workers . . . were improperly classified as independent contractors. Instead, the Court is only evaluating whether Plaintiff has demonstrated that he and the putative class members

are similarly situated for purposes of applying the economic realities test at the appropriate phase of this case in the future."); *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 662 F. Supp. 2d 1069, 1083 (N.D. Ind. 2009), *order clarified sub nom In re Fedex Ground Package Sys., Inc. Employment Practices Litig.*, No. 3:05-MD-527 RM, 2010 WL 597988 (N.D. Ind. Feb. 17, 2010). The Court must therefore determine whether the "proof to demonstrate that the workers are 'employees' or 'independent contractors' can be applied to the class as a whole." *Bamgbose*, 684 F. Supp. 2d at 668–69.

As Judge Hellerstein held in *New York Taxi Workers Alliance*, conditional certification is not appropriate where the allegedly misclassified workers at issue "can fit themselves, according to their investment, into different classes and have the right to work for rivals and work for themselves, and can assign the time and duration of their work," all of which "point to independence rather than dependence on an employer." No. 1:16-cv-04098-AKH (S.D.N.Y); Dkt No. 99, Hearing Transcript, 25:16-23.[8]

Here, the members of the purported collective operate in meaningfully different ways that preclude certification: Site Experts write on vastly different topics (*e.g.* football, fast food, reality TV); choose how best to run their FanSite, including which content to provide, how to present it, and who provides it; decide when to work and how much work to perform; and whether and to what extent to work with others. Given this individualized analysis, any challenge to independent-contractor status necessarily involves a fact-intensive inquiry that does not readily lend itself to collective treatment. *See Pfaahler v. Consultants for Architects, Inc.*, 2000 WL 198888, *2 (N.D. Ill. Feb. 8, 2000) (independent contractor analysis requires "a fact-intensive, individual determination" regarding plaintiffs' relationship with defendant); *Demauro v. Limo, Inc.*, No.

---

[8] Pursuant to Rule 2(D) of the Court's Individual Practices, a true and correct copy of this unpublished document is attached as Exhibit E to the Marcelino Declaration.

8:10-CV-413-T-33AEP, 2011 WL 9191, *3-4 (M.D. Fla. Jan. 3, 2011) (denying conditional certification of limo drivers classified as independent contractors). Indeed, the collective proposed by Plaintiffs would invite more differences than similarities in trying to determine who, if any, of the purported members are improperly classified as independent contractors.

### 1. Plaintiffs' Evidence Falls Far Short Of Establishing That FanSided Implemented A Common Unlawful Practice.

In an attempt to certify a *nationwide* class, Plaintiffs' submit declarations in support of their motions from three Site Experts—Carusillo, Gate, and Page.[9] (ECF Nos. 21-4; 21-5; 21-6.) Notably, absent however, is (1) sufficient testimony that they themselves are misclassified; and (2) *facts* demonstrating that other Site Experts are similarly situated with respect to any alleged misclassification or any violations of the FLSA. *See Levinson v. Primedia Inc.*, 2003 WL 22533428, at *1-*2 (S.D.N.Y. 2003) (denying motion to issue notice to putative collective for failure to establish other members were similarly situated).

FanSided's uniform treatment of Site Experts as independent contractors does not justify this Court certifying a collective and issuing notice to hundreds of Site Experts. *See, e.g., Nabi v. Hudson Grp. (HG) Retail,* LLC, 310 F.R.D. 119, 124 (S.D.N.Y. 2015) ("The mere fact that Defendants created a uniform job description for this position . . . is insufficient to create an inference that [the position is] generally misclassified."); *Pennington v. Integrity Communs., LLC*, No. 1:12–cv–5 SNLJ, 2013 WL 357516, at *2 (E.D. Mo. Jan. 29, 2013) (conditional class certification denied where plaintiffs failed to support claim for misclassification of independent contractors with sufficient evidence).

Courts have specifically held that assertions of misclassification alone are not sufficient to

---

[9] Page, a former Site Expert who is currently a Paid Contributor, submitted a declaration but has not opted into this suit.

show that a group is similarly situated. For example, in an exemption misclassification case, *Colson v. Avnet, Inc.*, the court explained that "sound public policy [considerations] and basic common sense" make clear that: "[T]he mere classification of a group of employees – even a large or nationwide group – as exempt under the FLSA is not by itself sufficient … If it were, in every instance where an employer is accused of misclassifying a large group of employees, the district court would then somehow be required to order collective action notification, irrespective of the quality or quantity of evidence that had been produced[.]" 687 F. Supp. 2d at 927-28 (D. Ariz. 2010) (citing *In re Wells Fargo*, 571 F.3d 953 (9th Cir. 2009)).[10]

Plaintiffs submit no competent evidence that they, or any of the putative collective members, are misclassified with respect to any factor actually involved in the independent contractor analysis. *Id.*; *see also Brown v. Barnes & Noble, Inc.*, 252 F.Supp.3d 255 (S.D.N.Y. 2017) (noting that plaintiffs "conclusory" and "potential incompletely descriptions of their job duties" was insufficient to conditionally certify a collective.)[11]

### 2.    Plaintiffs Failed To Make A Factual Showing That Extends Beyond Their Own Circumstances.

Plaintiffs have also failed to make a factual showing that extends beyond their own circumstances. *See Levinson v. Primedia Inc.*, No. 02 CIV.2222 (CBM), 2003 WL 22533428, at *2 (S.D.N.Y. Nov. 6, 2003).

---

[10] *See also Bamgbose v. Delta-T Group, Inc.*, 684 F. Supp. 2d 660, 668-670 (E.D. Pa. 2010); *Andel v. Patterson-UTI Drilling Co. LLC,* 280 F.R.D. 287, 294-296 (S.D. Tex. 2011); *Trinh v. JP Morgan Chase & Co.,* No. 07-CV-1666 W, 2008 WL 1860161, at *3 (S.D. Cal. Apr. 22, 2008); *Marsh v. Butler County School System*, 242 F.Supp.2d 1086, 1094-95 (M.D. Ala. 2003).

[11] Plaintiffs rely heavily on the order granting conditional certification in *Bradley v. Vox Media, Inc.*, No. CV 17-1791 (RMC), 2019 WL 1060804, at *3 (D.D.C. Mar. 6, 2019). However, *Bradley* is an unpublished, out-of-circuit decision of little persuasive value in light of the court's cursory analysis of the issue. *Id*. In *Bradley*, the Court focused on whether the alleged practice was common but did not address at all whether plaintiffs had made a sufficient showing that the practice was unlawful. *See id*. This was error. And while that may have been the *Bradley* court's interpretation of District of Columbia law, the Southern District of New York has held otherwise. *See, e.g.*, *New York Taxi Workers Alliance,* Case No. 16-cv-04098-AKH (Dkt. No. 98); *Levinson v. Primedia Inc.*, No. 02 CIV.2222 (CBM), 2003 WL 22533428, at *2 (S.D.N.Y. Nov. 6, 2003). In any event, this case needs to be evaluated on the evidence before the Court, not the evidence in the *Bradley* case.

Plaintiffs point only to the two Expert Services Agreements provided by the Plaintiffs in support of their claim that the entire proposed collective made less than minimum wage. (ECF No. 21-4; 21-5.) That is not enough. *See Levinson*, 2003 WL 22533428, at *2 ("Even if the assertion, found in each of plaintiffs' affidavits submitted to the court, that 'All guides worked under the same contracts,' were true, this would not constitute a showing that defendants' compensation structure violated the law.") If anything, the contracts show Site Experts are properly classified, given the various provisions vesting sole control of the performance of the services with the Site Expert. (*See, e.g.*, Best Dec. ¶ 6, Exs. A-B ¶ 4.) And as detailed below, Defendants' own evidence overwhelmingly points to Site Experts' bona fide independent contractor status.

In an attempt to broaden their allegations beyond the named Plaintiffs and show that the hundreds of others they seek to bring into this litigation also earned less than the minimum wage, Plaintiffs submitted virtually identical conclusory testimony. (*See, e.g.,* Carusillo Decl. ¶ 19.) These identical recitations are devoid of any actual facts, completely lack foundation seeing as Site Experts work remotely, and are insufficiently specific to show that others are similarly situated. *See Levinson*, 2003 WL 22533428, at *2 (noting that allegations such as, "For many guides, and perhaps most guides, myself included, the monthly compensation that was received was often less than the minimum wage of $5.15 an hour" were insufficient to show that others are similarly situated).

The case *Klein v. Octagon, Inc.* is instructive. No. 14 CIV. 6770 AT, 2015 WL 5821629, at *2 (S.D.N.Y. Sept. 30, 2015). In *Klein*, the plaintiff moved to conditionally certify a collective under the FLSA that consisted of unpaid interns. *Id*. The Court denied plaintiff's motion, noting that the declarations only "consist[ed] of the assertion that the declarants worked with or knew of other interns who were not being compensated for performing similar duties." *Id*. at *3. The Court

held that such assertions were insufficient; noting that they failed to address the substantive factors of the test of whether the putative collective members were interns or employees. *Id*. The same result is required here based on Plaintiffs' lack of evidence.

### C.   Individual Inquiries Preclude Conditional Certification.

To determine whether a collective is appropriate, the Court must consider whether the proof offered in support of the claim that the workers are "employees" can be applied to the putative collective as a whole. *See, e.g.*, *Christianson*, 2015 WL 1268259, *2-4 (denying conditional certification based on variations among putative collective members under the economic realities test). As the declarations submitted in support of this Opposition and those submitted by Plaintiffs show, there is substantial variation among Site Experts regarding the factors that determine their appropriate classification. Indeed, where there is some consistency, it supports FanSided's present classification of Site Experts as independent contractors.

For example, control is the first and most important factor under the economic realities test. *See Christianson*, 2015 WL 1268259 at *3. The testimony provided regarding this factor varies significantly among the declarants. Carusillo, Gate, and Page all allege (without further support) that their Editorial Directors exerted control over their work. (*See, e.g.*, ECF No. 21-4 (Carusillo Decl.), ¶ 14-16; ¶ 18; ECF No. 21-5 (Gate Decl.) ¶ 14-16; ECF No. 21-6 (Page Decl.) ¶ 12-14; ¶ 16.)[12] On the other hand, other declarants testify to how little control FanSided exerts over Site Experts, noting that they "control [their] own hours and set their own schedules" (Misener Decl. ¶ 7), that "FanSided has never told [them] what stories to cover or how to run [the] FanSite" (Smith Decl. ¶ 14), and "FanSided does not dictate how [they] write, curate or edit content" (Weiss Decl. ¶ 9). The evidence also shows that declarants differ in their ability to accept or reject story ideas,

---

[12] FanSided notes that Plaintiffs' testimony in this regarding is virtually identical.

with Plaintiffs and Mr. Page stating that they received direction from their Editorial Directors (*see, e.g.*, ECF No. 21-4, Carusillo Decl. ¶ 15), while others specifically rejected suggestions from Editorial Directors without consequence. (*See* Gurzi Decl. ¶ 8 ("I can accept or reject these suggestions as I please . . . I have rejected article suggestions from the Editorial Director.") Finally, some Site Experts, like Carusillo and Smith, write for other outlets into addition to their work on FanSided. (*See, e.g.*, Smith Decl. ¶ 10 (simultaneously wrote for other publications); *see also* Marcelino Decl., Exs. A-D (showing Carusillo's other publications, including one for a direct competitor)).

As another example, a workers' opportunity for profit and loss is a key factor under the economic realities test. Relevant evidence includes "the workers' abilities to negotiate their pay" and "their abilities to manage and hire others to perform the services." *Bamgbose v. Delta-T Grp., Inc.*, 684 F. Supp. 2d 660, 669–71 (E.D. Pa. 2010). Site Experts differ vastly in how they choose to operate to maximize the money they make in their positions, including choosing whether or not to invest in new equipment (e.g. computers or phone) or services (e.g. sports or premium TV packages) to facilitate their work; hiring or engaging contributors; and working with and negotiating with co-Experts on revenue splits. (*See* Gurzi Decl. ¶ 17 (deducts business expenses and invests in premium sports channel RedZone); Smith Decl. ¶ 15 (subscribes to NBA League Pass and Hulu Live for all sports writing work, including FanSided but also other sports websites); Cockrum Decl. ¶ (pays for ACC Network as investment to watch more games); *see also* Smith Decl. ¶ 13 (notes that he is able to bring on as much or as few contributors as he sees fit)).

Some Site Experts negotiate their rate, take on multiple FanSites and earn additional revenue by acting as Paid Contributor on different sites. (*See* Best Decl. ¶ 13 (Site Experts can and do work on multiple FanSites); Smith Decl. ¶ 16 ("As a Site Expert who writes relatively fewer

articles and spends more time working with contributors, I would have made less money under the new pay structure. So, when the change was made, I negotiated a minimum monthly payment from FanSided. I now earn $2,500 per month regardless of Hoops Habit's page views."); Cockrum Decl. ¶ 10 ("I am able to negotiate my fees with FanSided."); Weiss Decl. ¶ 6 (Site Expert on other FanSites); Oleszczak Decl. ¶ 9; Gurzi Decl. ¶ 6, 10; Cockrum Decl. ¶ 2 (Site Experts who are also Paid Contributors). Courts have ruled that such circumstances preclude conditional certification. *See Bamgbose*, 684 F. Supp. 2d at 670 (denying conditional certification because "some workers can negotiate their compensation"); *Christianson*, 2015 WL 1268259, at *4 (denying conditional certification because "rates negotiated by independent contractors . . . can vary significantly")). Analyzing whether any of the multitude of these different arrangements and decisions warrants employee classification is not amenable to a single, collective determination.

Likewise, Site Experts do not delegate their work to the same extent. Some share responsibility with a Co-Expert; others do not. Some Site Experts choose to be the sole content provider for their FanSites to keep a consistent tone and voice. (*See* Gurzi Decl. ¶ 12 (noting his preference for "more agency" in his FanSite.) Others engage a handful of Paid Contributors to increase the amount of content and page views, and while others still engage a cadre of dozens of Paid Contributors to keep their FanSites filled with constantly new, varied content. (*See, e.g.*, Misener Decl. ¶ 4 (noting that while he himself only writes about 25-30 articles a month, he relies on 90-100 contributor articles a month for content)). These profound differences among how Site Experts structure and create the content that is key to their profit and loss warrants denial of conditional certification. *See Andel*, 280 F.R.D. at 290 (denying conditional certification because, *inter alia*, plaintiffs' circumstances varied with respect to "whether or not [they] paid an assistant to help" with their duties).

Another consideration is "the alleged employee's investment in equipment or materials required for his task." Plaintiffs acknowledge that they used their own computers and smart phones in their roles as Site Experts. (*See, e.g.*, Gate Decl. (ECF No. 21-5) ¶ 21; Page Decl. (ECF No. 21-6) ¶ 21). Other Site Experts testified that they invested in new personal computers, phones, or other devices, specialized television and website subscriptions such as Hulu Live, NFL Redzone, and NBA Season Pass, or other products or services that they believe enable them to be a more successful Site Experts. *See Christianson*, 2015 WL 1268259, at *4 (denying conditional certification because "some putative class members purchase their own equipment, such as mud kits, printers, and office equipment"). Information regarding these varying decisions is unavailable without assessing each Site Expert's individual circumstances.

Another factor is the permanence or duration of the working relationship, which focuses on how long the worker is with the company and whether the worker had other employment. Here, there are clear variations in how long Site Experts engage with FanSided, as well as extreme variation in how often and how much Site Experts engage with other work. Carusillo engaged with FanSided for just a few months (ECF No. 21-4, ¶ 2), and Page engaged with FanSided for 7 months (ECF No. 21-6, ¶ 2). On the other hand, Gate engaged with FanSided for 2 years and 8 months. (ECF No. 21-5, ¶ 1). Other Site Experts engage intermittently with FanSided. For example, Smith started as a Contributor, became a Site Expert in 2015, then in 2018 decided to stop writing altogether, and then returned in March 2019. (Smith Decl. ¶ 3-8.)

The Site Experts' engagement with other work similarly varies such that conditional certification would be inappropriate. *See Christianson*, 2015 WL 1268259, at *3 (denying conditional certification because, inter alia, "there is evidence that certain workers classified as independent contractors work for other companies as well as [defendant], while others may

work only for [defendant]"). Many Site Experts have full-time jobs with other companies, and some have different working experiences altogether. (*See* Gurzi Decl. ¶ 2; Weiss Decl. ¶ 3.) For example, Gurzi is a full-time property appraiser for the Columbia County Tax Assessors' Office in Georgia. (Gurzi Decl. ¶ 2.) Smith is a professional poker player who does not keep consistent business hours and simultaneously writes for other sports websites. (Smith Decl. ¶ 3.) Jacob Misener is a marketing manager for a sports equipment company. (Misener Decl. ¶ 2.) On the other hand, Oleszczak was fully employed but now spends more time on Site Expert tasks because she is unemployed. (Oleszczak Decl. ¶ 2; *see also* Carusillo Decl.) To assess the impact of this factor of the classification of FanSided's Site Experts, the Court will need to consider the factual circumstances for each individual Site Expert.

###    D.    Variations In Potential Exposure Preclude Conditional Certification.

Even if Plaintiffs could articulate a common method by which to prove employment status that would not end the analysis. Individual questions would still remain regarding whether liability exists as to each Site Expert. *See Lugo v. Farmer's Pride Inc*., 737 F. Supp. 2d 291, 303 (E.D. Pa. 2010) (decertifying collective due to possibility certain collective members were not undercompensated). Indeed, each declaration submitted on behalf of FanSided shows that at least some Site Experts earned well above the minimum wage.

For example, Gurzi works 25 to 30 hours on FanSided-related activities, 15 to 20 hours of which are connected to his responsibilities as Site Expert for Dawg Pound Daily. (Gurzi Decl. ¶ 11). During the relevant period, Gurzi averaged about $1,505.80 per month in fees. (Best Decl. ¶ 16.) Assuming Gurzi worked 20 hours a week on Site Expert tasks, he earned over $18.00 per hour—well above the minimum wage. That figure even overstates Gurzi's time relevant to this suit because, in addition to working as a Site Expert for Dawg Pound Daily, Guriz earned fees as a Co-Site Expert of other FanSites on the Atlanta Falcons and Houston Texans and as a Paid

Contributor for other FanSites. (Gurzi Decl. ¶¶ 5, 10.) Gurzi currently earns between $3,000 and $3,500 per month in fees (or as much as $30 per hour) for his total FanSided work. (Gurzi Decl. ¶ 15). Further, Jacob Misener states that he works approximately 10 hours a week, but his average fees during the past two years is over $1,000 per month (up to $25 per hour). (Misener Decl., ¶ 5; Best Decl. ¶ 16.)

Site Experts' hours also vary depending on the popularity of the FanSite and team or topic. For example, a Site Expert who works on a FanSite for a very popular sports team may decide to work less because they earn enough fees without needing to publish very much content. (*See, e.g.,* Gurzi Decl. ¶ 7.) On the other hand, a Site Expert may have a less popular sport or team and decide to publish more content as a strategy to get more page views and earn more money. (*See, e.g.,* Oleszczak Decl. ¶ 5.) In each circumstance, Site Experts could be paid the same, or vastly different amounts, based not on the hours they worked, but on the success of their work in creating their FanSites, whether it be by their own writing ability, in-depth knowledge of the subject matter, sheer volume of content, or creating a compelling patchwork of solicited pieces by others. *See Christianson*, 2015 WL 1268259, at *3 (denying conditional certification where some workers classified as independent contractors "work significantly more" than others).

Finally, FanSided has no requirement or expectation as to the amount of time Site Experts work, nor does it monitor or track the hours worked by Site Experts. (Best Decl. ¶ 9). A lack of time records related to hours worked can be fatal to a motion to conditionally certify a collective under the FLSA. *Archer v. Freedmont Mortgage Corp.*, No. GLR-12-1099, 2013 WL 93320, at *4 (D. Md. Jan. 7. 2013) (denying certification in part because with lack of records, determining damages "would require a complex reconstruction not only of the Plaintiffs' work hours, but also those of each member of the proposed class."); *see also Dinkel v. MedStar Health, Inc.*, 880 F.

Supp. 2d 49, 57 (D.D.C. 2012). As in *Archer* and *Dinkel* the lack of records of the hours worked by Site Experts would render this collective unmanageable.

## IV.    NO CORRECTIVE NOTICE SHOULD ISSUE

As set forth in detail in FanSided's Motion to Communicate with the Putative Collective Members, FanSided's roll out of its arbitration agreement to Site Experts was proper. The Arbitration Agreement presented to current Site Experts *specifically carved out* this litigation. (*See* Best Decl. ¶ 6, Ex. A.)

FanSided did not improperly communicate with Site Experts who are putative collective members. (ECF No. 21-1, p. 23-24.) To contend otherwise, Plaintiffs present the *Paid Contributor* agreement signed by Page, not an Expert Services Agreement relevant to the putative class members. (ECF No. 21-6, Ex. 1.) Paid Contributors are not part of this lawsuit, and, so, are not part of the putative collective with whom FanSided purportedly cannot communicate. Further, it is irrelevant to this inquiry that a Paid Contributor may also be a Site Expert: the Arbitration Agreement in the Paid Contributor Agreement is limited to claims arising out of the individual's Paid Contributor services. (Best Decl. ¶ 7, Ex. C.) Plaintiffs have suggested that they believe the Paid Contributor agreement constitutes an improper communication with the putative class members in the scenario where a former Site Expert remains a Paid Contributor and was presented with an arbitration agreement in the Paid Contributor Agreements. It was never FanSided's intention and it does not intend to seek to enforce the Paid Contributor arbitration agreements with respect to the claims in this case.

Finally, even if the Arbitration Agreement was applicable to putative class members, which it is not, nothing about the Arbitration Agreement can be interpreted as intended to "confuse, intimidate, and otherwise improperly dissuade putative class members from joining this litigation" as Plaintiffs allege. The Arbitration Agreement contains multiple prominent disclaimers about the

Arbitration Agreement and an opt-out mechanism that allows individuals to easily opt-out (by whatever means they choose) within 30 days of acceptance. (Best Decl. ¶ 6, Exs. A-C.)

## V.      PLAINTIFFS' PROPOSED NOTICE AND DISTRIBUTION PROCESS IS IMPROPER

If the Court conditionally certifies the collective, Plaintiffs' proposed notice and notice process are improper, and Defendants object to the content and form of Plaintiffs' proposed Notice. Accordingly, Defendants respectfully request that, if the Court conditionally certifies a collective, the Court order the parties to (i) confer in an attempt to agree upon the content, form and distribution of notice, and (ii) to the extent they cannot agree on such matters, brief any outstanding issues for resolution by the Court.

### <u>CONCLUSION</u>

Because the issue of whether FanSided Site Experts are employees or independent contractors is not capable of efficient, collective-wide resolution, Plaintiffs' Motion must be denied.

Dated: October 30, 2020

*s/ Lyndsey M. Marcelino*

Lyndsey M. Marcelino
Admitted Pro Hac Vice
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
612.630.1000

Andrew M. Spurchise
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022.3298
212.583.9600

**ATTORNEYS FOR DEFENDANTS**

4819-7400-3658.1 104179.1002